UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STEVEN N., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00427 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**
(Docs. 11 & 16)

Plaintiff Steven N. is a claimant for Social Security Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA"). Pursuant to 42 U.S.C. § 405(g), he moves for judgment on the pleadings to reverse the decision of the Social Security Commissioner that he is not disabled.[1] The Commissioner has moved for judgment on the pleadings affirming the Commissioner's decision. The court took the pending motions under advisement on April 26, 2018.

After Plaintiff's DIB application was denied by the SSA, Administrative Law Judge ("ALJ") Bryce Baird found Plaintiff ineligible for benefits based on the conclusion that he could perform jobs that exist in significant numbers in the national economy and

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

was therefore not disabled at any time after his alleged onset date of May 21, 2012. Plaintiff requested review by the SSA's Office of Disability Adjudication and Review Appeals Council (the "Appeals Council") which denied his request,[2] making the ALJ's decision the final determination of the Commissioner. Plaintiff appeals that decision.

Plaintiff identifies three errors in the disability determination: (1) the Appeals Council erred in finding new evidence did not affect the ALJ's determination; (2) the ALJ improperly characterized two treating physicians' opinions in his determination of Plaintiff's Residual Function Capacity ("RFC"); (3) the ALJ failed to reconcile the Vocational Expert's ("VE") testimony with the selected characteristics of occupations as required by Social Security Ruling 00-04P.

Plaintiff is represented by Christopher Pashler, Esq. Special Assistant United States Attorney Heetano Shamsoondar represents the Commissioner.

## I. Procedural History.

On October 18, 2013, Plaintiff filed an application for DIB under Title II of the Social Security Act. His application was denied on January 22, 2014. Plaintiff timely requested a hearing before an ALJ on February 18, 2014.

On March 29, 2016, ALJ Baird presided over Plaintiff's hearing in Buffalo, New York. Plaintiff appeared in person at the hearing with his attorney and testified. VE Rachel Duchon also testified. On October 5, 2016, ALJ Baird issued a written decision finding Plaintiff not disabled.

Thereafter, Plaintiff filed a request for review with the Appeals Council and requested to supplement the record with medical evidence from Derek Gallucci, D.O. dated August 30, 2016; Daniel R. Wild, M.D. dated October 10 and 14, 2016; and Buffalo Medical Group ("BMG") dated December 19, 2016. On March 28, 2017, the Appeals Council denied Plaintiff's request for review. In doing so, it agreed to supplement the record with new medical evidence from Drs. Gallucci and Wild, but

---

[2] The Appeals Council acknowledged that it had "considered whether the [ALJ's] action, findings or conclusion [were] contrary to the weight of current evidence of record" and "looked at" the additional evidence Plaintiff submitted. (AR 2.)

rejected the BMG evidence as "new information [] about a later time" which therefore "[did] not affect the decision about whether [Plaintiff was] disabled beginning on or before October 5, 2016." (AR 2.)

## II.  Factual Background.

Plaintiff was born in 1961 and completed three years of college. Prior to ceasing employment, he worked as a restaurant cook and performed odd jobs. He ceased working as a cook in 2004 and ceased all other work in 2007. He alleges disability as a result of chronic obstructive pulmonary disease ("COPD"), degenerative arthritis of the knees, status post partial knee replacement surgery, and left rotator cuff tears with surgical repair.

### A.  Plaintiff's Medical History.

#### 1.  COPD.

On May 11, 2010, Plaintiff was evaluated by Sherif M. Sherif, M.D. at BMG after a CT scan revealed a lung nodule. Plaintiff complained of coughing, wheezing, and shortness of breath with exertion. Dr. Sherif found a severe obstructive pattern in Plaintiff's lungs which he classified as emphysema without reversibility. Plaintiff reported smoking up to a pack of cigarettes per day. Dr. Sherif referred Plaintiff for a CT-guided needle biopsy and recommended cessation of tobacco use.

On June 1, 2010, Plaintiff was evaluated by Dr. Sherif for his lung nodule and was advised that the CT-guided needle biopsy of the lung mass was negative and that Plaintiff also had a negative PET scan. Reduced air entry was, however, noted. Plaintiff again reported smoking up to a pack of cigarettes per day. Dr. Sherif prescribed Spiriva, continued use of Advair and ProAir, and tobacco cessation.

Plaintiff's lung nodule was evaluated by Dr. Sherif on November 30, 2010 and deemed benign, however, Dr. Sherif recorded reduced air entry. Plaintiff reported his smoking was unchanged from previous visits. Dr. Sherif recommended a follow-up CT scan in six months, an increased dosage of Advair, and tobacco cessation. A disorder of the rotator cuff was noted in Plaintiff's medical chart, but was not discussed.

Between May 26, 2011 and October 16, 2012, Plaintiff was evaluated by Dr. Sherif at four appointments during which Plaintiff reported no alteration in his tobacco use. Dr. Sherif described Plaintiff's lung nodule as stable and recommended continuing with prescribed inhalers and tobacco cessation.

On December 5, 2015, Plaintiff called an ambulance because he was having difficulty breathing. Emergency medical services ("EMS") administered a DuoNeb treatment and Plaintiff declined to be transported to the hospital. An hour later he again called EMS which administered another DuoNeb treatment and Solu-Medrol. Plaintiff was transported to a hospital's emergency department where he stated that he wanted to be discharged. He reported not taking some of his COPD medications due to a lack of financial resources.

## 2. Degenerative Arthritis of the Left Knee.

John A. Repicci, M.D., at Joint Reconstruction Orthopedics, was Plaintiff's primary treating physician for his knee disorder. On May 21, 2012, Plaintiff reported chronic pain in his left knee when rising from a chair or descending steps, difficulty standing on that knee, and pain with attempts at motion. Dr. Repicci noted multiple past surgeries on Plaintiff's right knee including a lateral compartment implant eight years prior which he described as "functioning quite well[.]" (AR 595.) Plaintiff was assessed to have an unsteady gait. His left knee extended fully, flexed to 125 degrees, and was tender laterally. Radiographs of it revealed complete loss of the joint space in the weight-bearing position. There was also mild medial osteophytosis.[3] Dr. Repicci diagnosed degenerative arthritis of the left knee affecting most severely the lateral compartment and ordered an MRI of that knee.

On May 29, 2012, an MRI of Plaintiff's left knee was performed and revealed an extensive complex tear of the lateral meniscus, osteoarthritis which was most advanced in the lateral compartment, and moderate effusion. Dr. Repicci recommended partial knee surgery and stated an eventual total knee replacement would be required. On October 16,

---

[3] Osteophytes are "bony outgrowth[s.]" Stedman's Medical Dictionary 1391 (28th ed. 2006) (hereinafter "Stedman's").

2012, Dr. Repicci performed a lateral compartment implant on Plaintiff's left knee. He evaluated Plaintiff on November 5, 2012 and assessed a septic left knee. Plaintiff was hospitalized to treat the infection. On November 19, 2012, Dr. Repicci reexamined Plaintiff's left knee and found it was healing well. He prescribed six weeks of antibiotics.

On December 12, 2012, Dr. Repicci reevaluated Plaintiff's left knee and determined that it flexed to 115 degrees and was stable. There was no clinical evidence of an active infection and Plaintiff was continued on intravenous antibiotics. At a January 2, 2013 appointment, Plaintiff's left knee flexed to 110 degrees. Dr. Repicci removed the peripherally inserted central catheter line that had been installed for Plaintiff's antibiotics and recommended observation. Thereafter, on January 30, 2013, Dr. Repicci examined Plaintiff's left knee which flexed to 125 degrees and showed no clinical evidence of infection. He recommended continued observation.

### 3. Disorder of Rotator Cuff in Left Shoulder.

On May 21, 2012, Dr. Repicci evaluated Plaintiff's left shoulder and noted multiple surgeries and Plaintiff's reports of chronic pain. A clinical examination revealed Plaintiff's left shoulder abducted to seventy degrees with external rotation to ten and internal rotation to ninety. Plaintiff reported discomfort with this motion. Dr. Repicci ordered radiographs which showed narrowing of the glenohumeral joint space and marked osteophytosis involving the humeral head. He opined that Plaintiff had degenerative arthritis in his left shoulder.

On March 8, 2013, Alfredo Rodes, M.D., at Southgate Medical Group, evaluated Plaintiff during a health maintenance visit and observed Plaintiff was "healthy, well developed, vigorous, well nourished, well groomed, appropriately dressed" with "no signs of acute distress[,]" and suffering from "simple obesity." (AR 625.) Plaintiff walked with a normal gait and had a full range of motion of the head and neck and was able to perform left and right straight leg raises with no lower back pain. Examination of his lower extremities revealed no instability bilaterally, intact strength with no pain, and full range of motion bilaterally. There was diminished strength in the left shoulder,

limited range of motion, and pain with movement. Strength in the right shoulder was intact without pain with a full range of motion.

Dr. Wild, an orthopedic surgeon at BMG, was Plaintiff's primary treating physician for his shoulder condition, including performing Plaintiff's left rotator cuff repair surgeries in 2009 and 2011. On May 17, 2013, Dr. Wild evaluated Plaintiff for reported severe pain in his left shoulder, lack of full range of motion, an inability to sleep because he could not lie on either side, a recent injury, and an inability to dress or lift repetitively over his head. Dr. Wild noted Plaintiff had two prior successful surgeries to the left shoulder which were followed by re-rupture. His physical examination revealed that Plaintiff's subscapularis strength was five out of five, infraspinatus strength was three out of five, supraspinatus strength was three out of five, [4] with a positive supraspinatus test and a positive painful arc of motion. All other findings were normal. Dr. Wild administered a cortisone injection to Plaintiff's left shoulder in an effort to reduce Plaintiff's discomfort. Dr. Wild referred Plaintiff for an x-ray and MRI to check for a possible recurrence of a rotator cuff tear. An x-ray and MRI of Plaintiff's left shoulder were taken that day.

Plaintiff's x-ray was reviewed by Jayant G. Kale, M.D. and found to suggest an "old fracture" (AR 641) but, compared with a prior x-ray, showed no change. Dr. Kale assessed Plaintiff to have mild arthritis in his left shoulder. Robert R. Conti, M.D. reviewed the MRI and found "advanced degenerative changes" in Plaintiff's left shoulder joint, joint debris, a "high-grade partial tear" in the subscapularis tendon, a likely tear in the biceps tendon, and "[e]xtensive degeneration with [a] possible tear" in the superior half of the glenoid labrum.[5] (AR 642.) These findings affirmed Dr. Wild's suspicion of

---

[4] The subscapularis, infraspinatus, and supraspinatus are all "m[uscles] of [the] shoulder joint, the tendon[s] of which contribute[] to the formation of the rotator cuff." Stedman's at 1245, 1254-55.

[5] The glenoid "resembl[es] a socket; denoting the articular depression of the scapula entering into the formation of the shoulder joint." Stedman's at 811. The labrum is a "lip around the margin . . . of some joints." *Id.* at 1038.

a rotator cuff tear and Plaintiff was referred for a surgical repair which was performed on July 2, 2013.

Approximately two weeks post-surgery, Dr. Wild performed a physical examination of Plaintiff. In doing so, he found Plaintiff's range of motion in the left shoulder was zero degrees and there was severe tenderness. Dr. Wild nonetheless recorded that that Plaintiff was "doing well," did not require physical therapy, and would do an exercise regimen as prescribed. (AR 645.) Dr. Wild opined that Plaintiff "[was] currently 100% disabled and unable to return to work. [Plaintiff] is not able to return to work at this time." *Id.* A few weeks later Dr. Wild again examined Plaintiff's left shoulder and noted mild tenderness in the shoulder but opined that Plaintiff was "doing well overall." *Id.*

Seven weeks post-surgery, Dr. Wild evaluated Plaintiff's left shoulder after Plaintiff "present[ed] . . . with continued symptoms in the shoulder." (AR 648.) Plaintiff reported being unable to sleep due to shoulder pain. Dr. Wild described moderate tenderness in the left shoulder and assessed its range of motion to be ninety degrees. Dr. Wild again opined that Plaintiff was "doing well overall[,]" did not require physical therapy, and was "currently 100% disabled and unable to return to work." *Id.* Dr. Wild administered a cortisone injection to treat Plaintiff's pain.

Nine weeks post-surgery, Plaintiff's left shoulder range of motion had improved to ninety-five degrees with moderate tenderness. Dr. Wild opined that Plaintiff was "doing fairly well overall" but that his left shoulder was still very painful. (AR 650.) He opined that Plaintiff was "100% disabled and unable to return to work." *Id.* He again administered a cortisone injection to treat Plaintiff's pain.

At a October 14, 2013 visit with Dr. Wild, Plaintiff reported moderate pain in his left shoulder, a limited range of motion, sleep disturbance, and an inability to dress or lift with his left shoulder. Physical examination revealed active elevation of the left shoulder was 140 degrees, active abduction was 110 degrees, internal rotation was limited by ten percent, and external rotation was eighty degrees. Subscapularis strength was rated five out of five, infraspinatus strength was three out of five, and supraspinatus strength was

three out of five. The supraspinatus test was positive with a positive painful arc of motion. All other findings were within the normal range. Dr. Wild recommended Plaintiff rest, ice his left shoulder, and avoid repetitive activities with it.

### 4. New Evidence Presented to Appeals Council.

On August 30, 2016, Dr. Gallucci conducted a new patient physical during which Plaintiff reported COPD, shoulder pain, knee pain, a broken clavicle two years prior, and complained of fatigue and a sleep disorder. Plaintiff further stated he had not been to a doctor for an extended period of time due to his lack of health insurance. Dr. Gallucci observed that Plaintiff appeared healthy and well developed with no signs of acute distress although he exhibited mildly decreased airflow with wheezing in the lungs bilaterally. Plaintiff's motor strength in his upper extremities was intact although he experienced pain with movement of the upper extremities bilaterally. His motor strength in his lower extremities was intact and exhibited a full range of motion bilaterally. Dr. Gallucci recommended Plaintiff follow-up with Dr. Sherif regarding his COPD. He diagnosed Plaintiff with primary osteoarthritis in his shoulders and recommended Plaintiff see an orthopedist. Dr. Gallucci further diagnosed Plaintiff with bilateral primary osteoarthritis of the knees.

On October 10, 2016, Dr. Wild evaluated Plaintiff for bilateral shoulder pain and ordered x-rays. Based on those x-rays, Dr. Wild observed degenerative changes in Plaintiff's right shoulder joint. In the left shoulder he found that "[t]here [was] marked deformity of the left shoulder that ha[d] progressed from previous exam" and the acromion[6] was partially destroyed and poorly visualized. (AR 725.) He further noted that "there [were] 3 large bone fragments present below the [acromioclavicular][7] joint as well as a smaller bone fragment[] projecting just above the glenohumeral joint.[8] (AR 725.) He noted progressive degenerative changes at the acromioclavicular joint and

---

[6] The acromion is part of the scapula. Stedman's at 19.

[7] A joint "between the clavicle and . . . the scapula." Stedman's at 19.

[8] The glenohumeral joint is "a ball and socket synovial j[oint] between the head of the humerus and the . . . scapula." *Id.* at 1014.

opined that was that Plaintiff had "[m]ild to moderate right [acromioclavicular] joint arthrosis"[9] and "[p]rogressive changes of the left shoulder in part postsurgical and in part degenerative[.]" (AR 726.) He recommended a CT scan for further assessment. Plaintiff reported a recent injury to his left shoulder and restricted daily activity in dressing and repetitive lifting over his head during the past three months. Based on a physical examination, Dr. Wild concluded that Plaintiff had pain in both shoulder joints and rotator cuff syndrome, and allied disorder in the right shoulder. He administered a cortisone injection to the left shoulder to treat Plaintiff's pain and opined that "[Plaintiff] is not able to return to work at this time." (AR 727.)

An October 14, 2016 physical examination performed by Dr. Wild of Plaintiff's left shoulder revealed major grating in the shoulder joint and limited elevation and abduction of the shoulder with pain on attempts. Plaintiff reported severe pain in the left shoulder, a lack of full range of motion, and sleep disruptions due to pain as well as restricted daily activities in dressing and repetitive lifting over his head. He also reported pain in his right shoulder which limited his ability to sleep on that side. His left subscapularis strength was five out of five, infraspinatus strength was three out of five, supraspinatus strength was three out of five with a positive supraspinatus test and a positive painful arc of motion. All other findings were within normal ranges. Dr. Wild opined that Plaintiff had pain in his right shoulder joint, a disorder of the left rotator cuff, a major acromioclavicular deformity and major changes to his left rotator cuff arthroplasty.[10] Dr. Wild also noted that Plaintiff had suffered a major separation of his clavicle from his scapula six months prior and still had a "major deformity from distal clavicle elevated posture[.]" (AR 728.) Dr. Wild opined that Plaintiff would need a reverse shoulder arthroplasty surgery on the left side and administered a cortisone injection to address Plaintiff's pain.

---

[9] "Degenerative joint changes" or osteoarthritis. Stedman's at 162.

[10] An arthroplasty is the "[c]reation of an artificial joint to correct advanced degenerative arthritis." Stedman's at 161.

## B. Plaintiff's Function Report.

On or about January 4, 2013, Plaintiff's spouse completed a Function Report in connection with Plaintiff's application for DIB wherein she indicated that he lived in a house with friends in Buffalo, New York and spent his days watching television, on the internet, playing video games, cooking, and cleaning the house. He also took care of pets, providing their food and water and cleaning their cages. She reported no difficulties with his personal care, personal grooming, or remembering to take medications and stated he prepared food for himself daily and was able to do light cleaning and laundry, but could not perform any household repairs, mowing, or shoveling. She reported that persistent pain affected his ability to sleep.

Plaintiff's spouse further reported that Plaintiff went outside daily in the summer and weekly in the winter and either walked or was a passenger in a vehicle because he did not have a driver's license. He shopped weekly for groceries and household items which took him approximately one to two hours to complete. He was also able to pay bills, count change, and manage a savings account.

Plaintiff enjoyed reading, watching television and movies, but was unable to engage in other physical or social activities because of his painful conditions. He socialized with others via the phone and computer on a daily basis but had difficulty getting along with family, friends, and neighbors. Depression was noted as a further reason for his limited participation in social activities. Plaintiff was reported to take over-the-counter Tylenol, 500 milligrams several times a day for his pain with little effect.

Plaintiff is right handed and was reportedly able to lift with his right arm but had limited ability to reach and lift with his left arm. He could not stand for long periods of time, had shortness of breath while walking or climbing stairs, and could not kneel or squat for any period of time. Plaintiff's spouse reported that he used a self-prescribed cane for walking long distances or on rough terrain and was able to walk approximately five hundred feet without needing to stop and rest.

### C.    Consulting Assessment.

On December 23, 2013, Samuel Balderman, M.D. performed a consulting internal medicine examination of Plaintiff in connection with his DIB application. Plaintiff had fractured his clavicle in November so his left arm was in a sling. Plaintiff complained of shortness of breath, left shoulder pain, and a constant, moderate, sharp pain in his left arm.

Dr. Balderman noted that Plaintiff had three prior operations on his left shoulder and partial knee replacements of both knees. Plaintiff denied drug or alcohol use but reported smoking a half a pack of cigarettes per day. With regard to his activities of daily living, Plaintiff stated that he lived alone and was able to bathe and dress himself.

A physical examination revealed that Plaintiff had no difficulty changing for the examination, rising from a chair, or getting on and off the examination table. He had a normal stance and gait, was able to heel toe walk normally, and squat to sixty percent. Plaintiff's reported use of a cane was consistent with his function report. Plaintiff's lungs were clear to auscultation and had normal percussion. Plaintiff's pulmonary function tests showed moderate obstructive disease which improved to mild obstructive disease with the use of bronchodilators.

Dr. Balderman's musculoskeletal examination indicated full flexion, extension, lateral flexion, and bilateral rotary movement in Plaintiff's cervical spine, and no abnormalities in his thoracic spine. His lumbar spine had full flexion, extension, and lateral flexion bilaterally, and full rotary movement bilaterally. Plaintiff's straight leg raise was negative bilaterally. He had a full range of motion in the right shoulder, but his left shoulder abducted at 100 degrees. Both knees flexed to approximately 120 degrees with a full range of motion in his hips and ankles. Dr. Balderman noted Plaintiff's joints were stable and non-tender. Plaintiff's strength was rated a five out of five in the upper and lower extremities. His hand and finger dexterity was intact and his grip strength was five out of five bilaterally.

Dr. Balderman diagnosed Plaintiff with "[s]tatus post left shoulder surgery x3[,]" "[s]tatus post bilateral partial knee replacements[,]" "[p]ulmonary disease by history[,]"

and "[s]tatus post left clavicle fracture, recent." (AR 663-64.) Dr. Balderman opined that Plaintiff had moderate to marked limitation reaching, pushing, and pulling due to left shoulder pain, but suggested these conditions should improve over the next eight to ten weeks to allow for healing of the clavicle. He described Plaintiff's prognosis as "[g]uarded." (AR 644.) He further opined that Plaintiff had moderate limitations in kneeling and climbing due to knee pain and moderate limitations in repetitive climbing and prolonged carrying due to pulmonary disease.

### D.    Testimony at the ALJ Hearing.

At the ALJ's March 29, 2016 hearing, Plaintiff testified that there were limited treatment records in his case because of his lack of insurance, transportation, and limited mobility, noting that he lost his insurance in 2013 when he separated from his wife. He testified that his Medicaid application had been pending for nine months.

When asked about his knee pain, Plaintiff testified that he was in constant pain in both knees which was exacerbated by any extended walking, standing, or climbing. A short walk to the store caused discomfort in both knees forcing him to stop and take breaks ranging from three to fifteen minutes. He further testified that he was unable to stand for more than ten to fifteen minutes at a time without serious discomfort.

With regard to his shoulder pain, Plaintiff testified that he was in constant pain and had limited mobility including difficulty reaching and stretching with his left arm. He stated that he could not reach his left arm across his body or behind his shoulder and that lifting anything over ten pounds caused him significant discomfort. He stated he could carry a gallon of milk in his left hand for no more than ten minutes without significant discomfort. To address his pain, Plaintiff immobilized his arm until his pain subsided, sometimes by wearing a sling. Plaintiff testified that the reduced mobility in his left arm limited the amount of physical activity he was able to do including general housework, yard work, and laundry because he was only able to use his right arm during those activities.

Plaintiff testified that he was diagnosed with COPD in 2012 or 2013 and that he had been diagnosed with asthma and emphysema prior to his COPD diagnosis. He noted

that the COPD impacted his ability to walk for extended periods of time and caused difficulty breathing in extreme hot or cold temperatures. Plaintiff explained that he had recently been seen at an emergency room because he had been unable to take full breaths, felt dizzy, and thought he was going to faint. He could generally minimize his shortness of breath by stopping what he was doing and relaxing for a few minutes up to an hour. He infrequently took prescribed inhalers to address his COPD since losing his health insurance in 2013. In response to questions from the ALJ, Plaintiff acknowledged that he smoked less than half a pack of cigarettes a day, that he had been consistently cutting down since being diagnosed with COPD, and that he had tried to quit numerous times without success despite cessation aids.

When questioned about his 2013 function report, Plaintiff described his daily activities as watching television, accessing the internet, playing video games, cooking, and cleaning the house. He explained that he was only able to use a video-game controller or type with his right hand.

Following Plaintiff's testimony, the VE testified that Plaintiff's prior work experience most closely matched the role of a restaurant cook as defined in the Department of Labor's Dictionary of Occupational Titles ("DOT"). The VE explained this was skilled work performed at a medium exertional level. The ALJ then presented the VE with two hypothetical individuals with Plaintiff's vocational and educational background. The first individual was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, and could only occasionally balance, stoop, kneel, and crouch. The first hypothetical individual was further limited to sitting for six out of eight hours in a workday, standing or walking for up to six hours in an eight hour work day, and limited to frequent climbing of ramps or stairs with no climbing of ladders, ropes, or scaffolds. The hypothetical individual was limited to frequent reaching with the left arm and "limited to environments where there's no exposure to excessively cold air . . . [or] excessive heat. No concentrated exposure to irritants such as odors, fumes, dusts, gases and poor ventilation." (AR 66.) The VE opined that, given those limitations, the hypothetical individual could perform the positions of a bottling line attendant, a box

sealing inspector, or a bulb filler, all of which existed in significant numbers within the national economy. In response to questions from Plaintiff's counsel, the VE opined that each of these positions required the use of both arms.

The second hypothetical individual with the same limitations as the first would be allowed to sit for up to ten minutes after standing or walking for up to fifteen minutes. The individual would remain on task while sitting, standing, or walking. The VE opined that the second individual could perform the same jobs as the first. The ALJ asked whether Plaintiff had acquired any skills from his past work. The VE responded that he had acquired cooking and food preparation skills. The ALJ then asked whether there were jobs the first or second hypothetical individual could perform which utilized those skills. The VE answered that the second hypothetical individual with skills in cooking and food preparation could be a cake decorator, test baker, or food preparation supervisor, positions which existed in significant numbers in the national economy.

The ALJ added limitations of occasional reaching with the left arm, occasional overhead reaching with the left arm, occasional gross manipulation with the left hand, and occasional fine manipulation with the left hand. The VE opined that the individual could act as a counter clerk, host, or usher, positions which existed in significant numbers in the national economy, however, that individual would not be able to perform the positions of cake decorator, test baker, or food preparation supervisor.

Finally, the ALJ asked the VE to consider the second hypothetical individual with the additional limitation of being off-task for approximately twenty-five percent of the work day in addition to regularly scheduled breaks as a result of knee pain, shoulder pain, and shortness of breath. The VE opined that individual would not be able to perform any work in the national economy.

## III.    Application of the Five-Step, Sequential Framework.

An ALJ must follow a five-step, sequential framework to determine whether a claimant is disabled:

>    (1) whether the claimant is currently engaged in substantial gainful activity;
>    (2) whether the claimant has a severe impairment or combination of

impairments; (3) whether the impairment meets or equals the severity of the
specified impairments in the Listing of Impairments; (4) based on a
"residual functional capacity" assessment, whether the claimant can
perform any of his or her past relevant work despite the impairment; and
(5) whether there are significant numbers of jobs in the national economy
that the claimant can perform given the claimant's residual functional
capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.
§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of
proving that he or she has a disability within the meaning of the Act, and bears the burden
of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step
framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128
(2d Cir. 2008) (citation omitted) (internal quotation marks omitted). At Step Five, "the
burden shift[s] to the Commissioner to show there is other work that [the claimant] can
perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks
omitted).

In this case, ALJ Baird concluded at Step One that Plaintiff had not engaged in
substantial gainful activity since October 18, 2013, his DIB application date. At Step
Two, he concluded that Plaintiff possessed the severe impairments of COPD,
degenerative arthritis of the knees, status post partial knee replacement surgery, and left
rotator cuff tears with surgical repairs.

At Step Three, the ALJ determined that none of Plaintiff's severe impairments,
either in isolation or combination, met or medically equaled the severity of a listed
impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated Plaintiff's
arthritis in the context of listing 1.02, which addresses major dysfunction of a joint.
Because Plaintiff neither established that he was unable to ambulate effectively, nor
established that he was unable to perform fine and gross movements effectively, the ALJ
concluded that the listing was not satisfied.

The ALJ evaluated Plaintiff's COPD in terms of whether it satisfied listing 3.02
which addresses chronic pulmonary insufficiency. Because the record did not support
that Plaintiff's forced expiratory volume values were not equal to or less than 1.25, or

15

that Plaintiff had chronic impairment of gas exchange or significantly abnormal arterial blood gas values, the ALJ concluded that this listing was also not satisfied.

In defining Plaintiff's RFC, the ALJ reviewed Plaintiff's medical records and concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (AR at 25.) The ALJ gave little weight to the opinion of Dr. Wild, a treating physician, reasoning as follows: "[the] opinion is a vague statement of disability regarding the claimant's ability to perform his past work, and not a function-by-function statement of the claimant's ability to perform work . . . [the] opinion is not inconsistent with the [RFC] as it would preclude [Plaintiff] returning to his past relevant work." *Id.* The ALJ did not specifically address the opinions of treating physician Dr. Repicci.

The ALJ accorded Dr. Balderman's opinion "great weight" noting that "Dr. Balderman opined that [Plaintiff] would have moderate to marked limitation reaching, pushing, and pulling due to left shoulder pain" but that "Dr. Balderman stated that the [Plaintiff's] limitations would improve[.]" (AR 25-26.)

At Step Four, the ALJ found that Plaintiff:

has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except: the [Plaintiff] can lift and/or carry up to 20 pounds occasionally, and up to 10 pounds frequently. [Plaintiff] can sit for a total of six hours, stand or walk for a total of six hours in an eight-hour workday; can sit for up to 10 minutes at a time, after standing or walking for 10 minutes at a time, all while on task. [Plaintiff] can frequently climb ramps or stairs; can occasionally balance, kneel, and crouch; and can never climb ladders, ropes or scaffolds, and never crawl. [Plaintiff] can frequently reach, including overhead reaching, with left arm; can never tolerate concentrated exposure to excessive heat or cold, and never tolerate concentrated exposure to pulmonary irritants such as odors fumes dusts gasses or poor ventilation.

(AR 24.)

At Step Five, the ALJ found that Plaintiff could not perform past relevant work but could perform the positions of cake decorator, test baker, and food prep supervisor,

all of which existed in significant numbers within the national economy. He therefore concluded that Plaintiff was not disabled.

## IV.     Conclusions of Law and Analysis.

### A.     Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g).

### B.     Whether the Appeals Council Erred in Finding the New Evidence Did Not Affect the Outcome.

Plaintiff contends that the Appeals Council erred by deciding the new evidence did not provide a basis for overturning the ALJ's determination and by failing to provide good reasons for rejecting Dr. Wild's 2016 opinions. Plaintiff argues that the new evidence he presented to the Appeals Council demonstrates that the RFC is not supported by substantial evidence because, contrary to Dr. Balderman's opinion, his condition did not improve.

Dr. Balderman examined Plaintiff when he had a broken clavicle and a sling on his left arm. After the examination Dr. Balderman concluded that Plaintiff had

17

"moderate to marked limitation reaching, pushing, and pulling due to left shoulder pain" and opined that these "[l]imitations should improve over the next eight to ten weeks to allow for healing of the clavicle" but stated that his prognosis was "guarded." *Id.* The ALJ cited Dr. Balderman's opinion that Plaintiff's limitations "would improve after healing of the [Plaintiff's] left clavicle fracture and surgery" but substituted "would" for "should." (AR 26.)

The only evidence from the period during which Dr. Balderman stated Plaintiff's limitation might improve is the new evidence from 2016 which was submitted to the Appeals Council and is part of the record on appeal. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) ("[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."). Although the Commissioner asserts that the new evidence supports that Plaintiff's limitation was temporary because his left shoulder abduction and elevation improved between December 2013 and October 2016, Plaintiff contends that Dr. Wild's 2016 opinions show his condition deteriorated. Plaintiff has the better part of the argument. Dr. Wild found that Plaintiff's shoulder had deteriorated and required further surgery. *See, e.g.*, AR 729 (opining that there were major degenerative changes to Plaintiff's rotator cuff, degeneration of the prior surgical repair, and that Plaintiff was unable to return to work). ALJ Baird's determination that improvement was inevitable is thus not supported by substantial evidence in the record and therefore not "adequate to support [the ALJ's] conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). As expected improvement in Plaintiff's left shoulder was a factual predicate for Plaintiff's RFC, a remand is warranted to include the new evidence in the RFC determination. *See Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999) (remanding because "the ALJ did not have substantial evidence justifying her decision that [claimant] retained the [RFC] to meet the exertional demands [set out in the RFC].").

## C.   Whether the ALJ Properly Evaluated the Medical Opinions of Drs. Wild and Repicci.

Plaintiff contends that the ALJ improperly characterized his treating physicians' opinions as conclusory statements of disability and discounted them on that basis without proper application of the treating physician rule.[11]  Under the treating physician rule, a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993) (explaining the SSA regulations give "controlling weight" to a treating physician's opinion "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence") (internal quotation marks omitted).

Even when a treating physician's opinion is not given controlling weight, the opinion is generally entitled to some weight because a treating physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ."  20 C.F.R. § 404.1527(c)(2).  When the ALJ decides to afford less than controlling weight to a treating physician's opinion, the ALJ must consider certain factors in determining how much weight is appropriate.  *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) ("[Specific F]actors [] must be considered when the treating physician's opinion is not given controlling weight[.]").  These factors include: the length of the treatment relationship; the frequency of examination; the supportability of the opinion; whether the opinion is consistent with the record as a whole; and whether the opinion is given by a specialist about medical issues related to his or her area of specialty.  20

---

[11] A treating physician is "[Plaintiff's] own acceptable medical source who provides [Plaintiff], or has provided [Plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [Plaintiff]."  20 C.F.R. § 404.1527(a)(2).  An ongoing treatment relationship is found when "the medical evidence establishes that [Plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [Plaintiff's] medical condition(s)."  *Id.*

C.F.R. § 404.1527(c). After considering these factors, the ALJ must "give good reasons" for the weight afforded to the treating source's opinion. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation marks omitted).

The Second Circuit has consistently held that the failure to provide good reasons for rejecting the opinion of a treating physician is grounds for remand. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) ("[B]ecause . . . the ALJ . . . failed to follow SSA regulations requiring a statement of valid reasons for not crediting the opinion of plaintiff's treating physician . . . a remand is necessary in order to allow the ALJ to reweigh the evidence.").

The ALJ was correct in finding that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled," because that is an "administrative finding[] [which is] dispositive of [the] case," and thus is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). However, it does not mean that the ALJ is required to reject the opinion in its entirety.

> Reserving the ultimate issue of disability to the Commissioner relieves the [SSA] of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation, under *Schaal* and § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable. A claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.

*Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). A physician's statement of disability is thus evaluated under the factors outlined in § 404.1527(c). *See Solsbee v. Astrue*, 737 F. Supp. 2d 102, 113 (W.D.N.Y. 2010) ("[I]f the case record contains an opinion from a

medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.") (internal quotation marks omitted).

### 1. Dr. Wild.

Plaintiff contends that ALJ Baird failed to properly evaluate Dr. Wild's 2013 opinions in which Dr. Wild stated that Plaintiff was "100% disabled and unable to return to work" because ALJ Baird inadequately evaluated the factors listed in 20 C.F.R. § 416.927(c)(2)-(5) and because the ALJ failed to contact Dr. Wild for additional information. (AR 646.) ALJ Baird accorded Dr. Wild's opinion little weight as "a vague statement of disability" and "not a function-by-function statement of the [Plaintiff's] ability to perform work, (AR 25) and reasoned that it was "not inconsistent with the residual functional capacity [] as it would preclude returning to [Plaintiff's] past relevant work[.]" (AR 25.) In reaching this conclusion, he did not mention that Dr. Repicci, another treating physician, has reached a similar conclusion, opining that Plaintiff would qualify for "Social Security Disability." (AR 595.)

Dr. Wild had an extensive treatment relationship with Plaintiff from 2012 to 2016 during which he examined Plaintiff seven times, performed a surgical rotator cuff repair, recorded information about Plaintiff's condition and its impact on his daily activities, and repeatedly concluded he was unable to work. As an orthopedic surgeon, his opinions regarding Plaintiff's shoulder limitations are "about medical issues related to his or her area of specialty[.]" 20 C.F.R. § 404.1527(c)(5). His opinions that Plaintiff's left shoulder had experienced degenerative changes and that Plaintiff was unable to return to work were supported by objective tests such as MRIs and numerous physical examinations. They were also consistent with the opinions, treatment notes, and evaluations of Drs. Repicci, Gallucci, and Rodes. Finally, they are not contradicted by any medical or factual evidence in the record. If ALJ Baird was unsure whether Dr. Wild's opinion extended to all work or just Plaintiff's past relevant work, the ALJ was required to "recontact [Dr. Wild] for clarification of the reasons for the opinion[.]" SSR 96-5P, 1996 WL 374183, at *6 (July 2, 1996). The ALJ was not free to provide his own

rationalization or explanations. *See Glover v. Astrue*, 2010 WL 1035440, at *4 (W.D.N.Y. Mar. 18, 2010) (noting an ALJ may not make "inferences . . . not advanced in the medical record").

Because ALJ Baird did not "comprehensively set forth reasons for the weight assigned to a treating physician's opinion[,]" *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (alteration in original) (internal quotation marks omitted), and ALJ Baird erred in failing to provide "good reasons" for assigning little weight to Dr. Wild's opinions, a remand for a determination of the good reasons, if any, for according Dr. Wild's opinions less than controlling weight is required. *See Schaal*, 134 F.3d at 505 (holding that "because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physicians opinion, remand is necessary") (internal citation omitted). If the ALJ on remand requires a functionary evaluation from Dr. Wild in order to assess his opinions, he or she may seek this and other evidence from the treatment provider.

### 2.   Dr. Repicci.

Plaintiff asserts that ALJ Baird failed to address the medical opinion of Dr. Repicci that, "with due regard to [Plaintiff's] pulmonary condition, shoulder condition and bilateral knee condition, he would be eligible for Social Security Disability." (AR 595.) The Commissioner acknowledges that ALJ Baird did not mention any of Dr. Repicci's opinions, she, however, contends that ALJ Baird's analysis of Dr. Wild's opinions applies with equal force to Dr. Repicci's opinions.

Dr. Repicci is a treating physician under the SSA regulations. He performed both of Plaintiff's partial knee replacements, treated Plaintiff for more than two years and, in that time, evaluated Plaintiff seven times. Because it is not clear that ALJ Baird considered Dr. Repicci's opinions, the Commissioner's ad hoc rationalizations cannot bridge the evidentiary gap. *See Glessing v. Comm'r of Soc. Sec. Admin.*, 725 F. App'x 48, 50 (2018) ("[W]e cannot accept the Commissioner's post hoc justification of the ALJ's decision on appeal.") (emphasis omitted). This court may not therefore assume that ALJ Baird assigned little weight to Dr. Repicci's opinions for the same reasons ALJ

Baird discounted Dr. Wild's opinions. *See id.*; *see also Burgess*, 537 F.3d at 128

(explaining a reviewing court "may not properly affirm an administrative action

on grounds different from those considered by the agency") (internal quotation marks

omitted). Even if this was in fact the ALJ's rationale, there would still need to be "good

reasons" for assigning Dr. Repicci's opinions little weight. *Schaal*, 134 F.3d at 505; *see*

*also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Burgess*, 537 F.3d at 129-30

("Failure to provide [] good reasons for not crediting the opinion of a claimant's treating

physician is a ground for remand.") (internal quotation marks omitted). Because the

court is left to speculate as to what weight, if any, ALJ Baird accorded to Dr. Repicci's

opinion, a remand is appropriate. *See Smith v. Comm'r of Soc. Sec.*, 2011 WL 6372792,

at *9 (D. Vt. Dec. 20, 2011) (remanding because "[t]he failure to evaluate the medical

evidence . . . and the failure to explain the apparent rejection of medical opinions . . .

w[ere] legal error[s which] prevent[ed] the Court from ascertaining whether substantial

evidence supported the ALJ's decision").

> **D.** **Whether the ALJ Failed to Reconcile the Vocational Expert's Testimony with the Selected Characteristics of Occupations.**

Plaintiff challenges his RFC determination on the basis that ALJ Baird failed to

reconcile the VE's testimony with the Selected Characteristics of Occupations Defined in

the Revised Dictionary of Occupational Titles ("SCO") because one of the representative

positions identified by the VE, food prep supervisor, exceeded the Plaintiff's RFC

because Plaintiff "can never tolerate concentrated exposure to excessive heat or cold[.]"

(AR 24.) According to the SCO, the duties of a food prep supervisor include

"occasional" exposure to "[e]xtreme [h]eat, which is defined as "[e]xposure to non-

weather-related hot temperatures" for "up to 1/3 of the time[.]" Selected Characteristics

of Occupations Defined in the Revised Dictionary of Occupational Titles at 149 and app.

D at D-1 (1993). Plaintiff argues this error necessitates remand so that the ALJ can

reconcile the apparent conflict. The Commissioner contends that there is a difference

between "concentrated exposure to excessive heat" and "occasional exposure to extreme

heat" (Doc. 16-1 at 23) and thus there is no conflict to reconcile.

Social Security Ruling 00-4P states that "[w]hen there is apparent unresolved conflict between VE . . . evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000). "The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . rather than on the DOT information." *Id.* When an ALJ fails to reconcile VE testimony with the DOT information, remand may be appropriate. *See Patti v. Colvin*, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015) (remanding "[b]ecause the ALJ [] elicited neither the basis for the VE's testimony that plaintiff could perform the jobs despite a limitation for only occasional reaching, nor a reasonable explanation for her deviation from the DOT").

According to the SCO, the food preparation position would expose Plaintiff to extreme heat for up to one-third of the work day, which appears to exceed an RFC that precludes "concentrated" exposure to extreme heat. If there is a difference between the two terms, the ALJ is required to explain it. ALJ Baird did not "elicit a reasonable explanation for the conflict" between the VE's testimony that Plaintiff could perform the food preparation supervisor job and the SCO. SSR 00-4P, 2000 WL 1898704, at *2. Any error, however, is harmless.[12] However, because "[t]he Commissioner need show only one job existing in the national economy that [Plaintiff] can perform[,]" *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011); *see* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b), and at Step Five, ALJ Baird identified three jobs Plaintiff could perform,

---

[12] Although the Second Circuit has not articulated a specific test for harmless error in Social Security appeals, it has noted that an error cannot be deemed harmless if "there is a substantial possibility" that the plaintiff would have "prevailed" absent the ALJ's mistake. *Pollard v. Halter*, 377 F.3d 183, 192 (2d Cir. 2004). This approach comports with the Ninth Circuit's observation that an error may be deemed harmless only if it is "inconsequential to the ultimate nondisability determination." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (emphasis omitted).

any error was harmless. In light of Plaintiff's alleged ability to perform two of the three positions identified, cake decorator and test baker, a remand on this issue is not required.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for judgment on the pleadings (Doc. 9) and DENIES the Commissioner's motion for the same. (Doc. 16.) The court REMANDS this case and requests that the ALJ to re-evaluate Drs. Wild and Repicci's treating physician opinions and re-consider Plaintiff's RFC in light of evidence that his left shoulder condition did not improve during the relevant period.

SO ORDERED.

Dated at Burlington, Vermont, this _17th_ day of December, 2018.

Christina Reiss, District Judge
United States District Court